**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005,
                        Plaintiff,

                v.                                          Civil Action No. 1:26-cv-1559

FEDERAL ELECTION COMMISSION
1050 First Street NE,
Washington, DC 20463,
                        Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This lawsuit challenges a 2024 Advisory Opinion issued by the Federal Election Commission ("FEC" or "Commission") that unlawfully permits federal candidates to outsource and conceal untold millions of dollars in campaign spending through overtly coordinated canvassing financed by ostensibly "independent" outside groups. The FEC, despite conceding that the coordinated payments described in the Advisory Opinion were "expenditures" under the Federal Election Campaign Act ("FECA" or the "Act")—and in brazen defiance of the Act's mandate to treat all "expenditures" coordinated with federal candidates as in-kind contributions to such candidates—found that the proposed spending would not give rise to any coordinated expenditures or in-kind contributions subject to FECA's contribution limits, source restrictions, and associated disclosure requirements. *See* FEC Advisory Opinion 2024-01, Texas Majority PAC (dated Mar. 20, 2024), https://www.fec.gov/files/legal/aos/2024-01/2024-01.pdf.

2.      Plaintiff Campaign Legal Center ("CLC") accordingly brings this action for declaratory and injunctive relief under the Administrative Procedure Act ("APA") to challenge Advisory Opinion 2024-01 as contrary to FECA, arbitrary and capricious, and otherwise not in accordance with law. *See* 5 U.S.C. § 706(2).

1

3.      Because favorable Commission advisory opinions afford the requestor, and any person involved in a transaction or activity "indistinguishable in all its material aspects from the transaction or activity" described in the request, a safe-harbor protection from any sanction under the Act, *see* 52 U.S.C. § 30108(c), FEC advisory opinions "have binding legal effect on the Commission," *FEC v. Nat'l Rifle Ass'n*, 254 F.3d 173, 185 (D.C. Cir. 2001), and palpably shape the behavior of the regulated community.

4.      Advisory Opinion 2024-01, issued by the FEC on March 20, 2024, responded to a request from a Texas-based state political committee that asked whether its payment for scripts and personnel to conduct door-to-door canvassing would be treated as a contribution to a federal candidate, and subject to the applicable amount and source limits, if the group coordinated its canvassing activities with that candidate. *See* Advisory Opinion Request 2024-01, Texas Majority PAC (dated Jan. 12, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401R_1.pdf ("TMP AOR"). The group asked because FECA provides that all "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, *shall* be considered to be a contribution to such candidate." 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added). In contravention of this explicit statutory text, however, the FEC responded that expenditures for canvassing that are coordinated with a candidate's campaign committee are not "coordinated expenditures" for purposes of the FEC's coordination regulations, and thus are not contributions subject to disclosure or FECA's amount and source limits. *See* Advisory Opinion 2024-01 at 1.

5.      The Commission thus gave its imprimatur to a legal opinion that paves the way for the wholesale evasion of FECA's coordination provisions with respect to canvassing activities— even when payments for those activities are fully coordinated with, and indisputably made "for

the purpose of influencing" the elections of, federal candidates. *See* 52 U.S.C. § 30101(9) (defining

"expenditure"). But under FECA, all coordinated expenditures are considered in-kind campaign

contributions, and are therefore required to conform to the Act's comprehensive reporting

requirements, contribution limits, and source restrictions. The FEC's determination that federal

candidates and parties can nevertheless freely coordinate canvassing expenditures with groups not

subject to the Act's disclosure obligations or contribution limits is impossible to square with the

statutory text, patently unlawful, and must be set aside.

6. Predictably, the massive loophole in federal campaign finance law opened by the

FEC's Advisory Opinion has already led to rampant abuse. Permitting federal candidates and

political parties to coordinate virtually without limit on canvassing expenditures benefiting and

even expressly advocating their election campaigns—and to simultaneously avoid disclosing the

resulting in-kind contributions in accordance with FECA's comprehensive transparency

requirements—undermines the Act's central anticorruption and transparency purposes, and

concretely harms plaintiff CLC.

7. Although the Supreme Court has concluded that truly *independent* expenditures

may not "pose dangers of real or apparent corruption," it has nevertheless recognized that

*coordinated* expenditures function as "disguised contributions"—and the failure to regulate them

as such creates an acute risk of corruption and deprives the public of valuable information about

the true sources of candidates' financial support. *Buckley v. Valeo*, 424 U.S. 1, 46-47 (1976) (per

curiam). If coordinated expenditures are not subject to contribution limits and source restrictions,

wealthy donors, rent-seeking plutocrats, and anyone else in the market for political favors can

readily procure influence over candidates and officeholders by making campaign expenditures at

their behest, raising the "danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.* at 47.

8.    Likewise, without the full and accurate reporting of coordinated expenditures as in-kind contributions, voters will not have the campaign finance information necessary to "place each candidate in the political spectrum," understand "the interests to which a candidate is most likely to be responsive," or make "predictions of future performance in office," *id.* at 67—all of which are crucial to casting an informed and meaningful vote.

9.    Because of the Advisory Opinion, however, plaintiff CLC, as well as the public, is deprived of vital, statutorily required information about the scale and scope of campaign contributions flowing to federal candidates and political parties in the guise of coordinated canvassing expenditures. As for the subset of groups that have reported *any* spending to the FEC that may reflect coordinated canvassing-related expenditures following the Advisory Opinion, such reporting is not just widely variable, but necessarily incomplete, because it is limited to the spender side of the coordinated transaction and fails to identify which expenditures were coordinated with which candidates. Worse, some non-disclosing "dark money" groups are reportedly making coordinated canvassing expenditures but disclosing nothing at all. It is therefore impossible to know the precise magnitude of undisclosed coordinated spending the Advisory Opinion has facilitated, much less to discern the actual sources and amounts of contributions made to specific candidates or parties in the form of coordinated canvassing expenditures.

10.    As set forth in more detail below, Advisory Opinion 2024-01 ignores FECA's text and frustrates its purposes, including its goals of preventing the corruptive effect of large "disguised" contributions and providing the electorate with complete and accurate disclosure "as

to where political campaign money comes from and how it is spent by the candidate." *Buckley*, 424 U.S. at 66.

11.    Accordingly, plaintiff seeks a judicial declaration that Advisory Opinion 2024-01 contravenes FECA and is arbitrary, capricious, and contrary to law, in violation of the APA, and an injunction vacating and setting aside Advisory Opinion 2024-01.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1331. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

13.    Venue lies in this district under 28 U.S.C. § 1391(e)(1).

## PARTIES

14.    Plaintiff CLC is a nonpartisan nonprofit organization that works to strengthen American democracy through, *inter alia*, activities seeking to ensure that the public has access to information regarding the financing and spending of U.S. election campaigns.

15.    As part of this effort, CLC conducts research, authors reports and articles, and regularly provides expert analysis to the media. CLC also litigates throughout the country regarding campaign finance matters; files FEC complaints requesting that enforcement actions be taken against individuals or organizations that violate the law; participates in rulemaking and advisory opinion proceedings before the FEC to ensure the agency is properly interpreting and enforcing federal campaign finance laws; and engages in legislative advocacy for reform measures at the federal, state, and local levels.

16.    Disclosure reports filed with the FEC are a vital source of campaign finance information, which CLC uses for its fact-based legal analysis and evaluation of existing and proposed campaign finance laws, as well as to educate the public about the sources and extent of

candidates' financial support so that voters can evaluate the full context of the political messages they hear. *See Issues: Campaign Finance*, Campaign Legal Ctr., https://campaignlegal.org/issues/campaign-finance (last visited May 5, 2026).

17.     CLC uses information obtained from FEC disclosure reports in preparing testimony or public comment for Congress or for state and local legislatures and agencies, as well as to produce in-depth research reports and publications, op-eds, blog posts, and other commentary through appearances on broadcast media and in interviews for print and web publications. These communications are directed toward educating policymakers and the public about the true sources of money raised and spent to influence elections and the scale of candidate campaign spending, whether the money is contributed to or spent by candidates, political parties, other political committees, or non-committee individuals or entities.

18.     CLC expends significant resources assisting reporters and other members of the media in their investigative research into candidates' and parties' financial activities, to ensure that the public is equipped with the information necessary to evaluate different candidates and messages and cast informed votes.

19.     CLC also uses its analyses of federal campaign finance disclosure information to support its administrative practice at the FEC and before state and local campaign finance agencies, and to defend campaign finance laws in its active docket of cases in federal and state courts.

20.     When inadequate or incomplete disclosure of federal campaign finance activity makes it difficult to track a political committee's fundraising or spending, reporters often contact CLC for guidance as to whether or where they can find the campaign finance information that is not being properly reported. This work requires CLC to divert resources and funds from other organizational needs.

21. CLC thus relies on the accurate and complete reporting of campaign finance information to carry out activities central to its programmatic mission, including the production of reports and other materials to educate the public about campaign spending. These activities are obstructed when information that is subject to mandatory disclosure under FECA is not publicly available. By issuing an Advisory Opinion that purports to remove vast swaths of federal campaign spending from FECA's mandate for "total disclosure" of the funds raised and spent in federal elections, *Buckley*, 424 U.S. at 76—including contributions taking the form of coordinated expenditures—the FEC has denied plaintiff access to statutorily required information upon which CLC depends, and CLC suffers concrete informational and organizational harms as a result.

22. Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106(b).

## FACTUAL ALLEGATIONS

### I. Statutory and Regulatory Framework

#### A. FECA's Regulation of "Expenditures" Coordinated with Federal Candidates and Political Parties as Contributions

23. Under FECA, a "contribution" is a "gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). The statutory phrase "[a]nything of value" encompasses "all in-kind contributions," 11 C.F.R. § 100.52(d)(1), including "the payment . . . of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose," 52 U.S.C. § 30101(8)(A)(ii), and "expenditures" that are coordinated with candidates.

24. The Act defines an "expenditure," subject to certain exclusions not relevant here, as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of

value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A). FECA further provides that any expenditure "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, *shall be considered to be a contribution to such candidate*." 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added).

25. Accordingly, under the Act, any "expenditure" made "in cooperation, consultation, or concert" with a candidate is a coordinated expenditure and a contribution to such candidate.

26. The Supreme Court has endorsed this treatment of "coordinated" spending, recognizing that "expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and . . . pose similar dangers of abuse." *Buckley*, 424 U.S. at 46.

27. Because a coordinated expenditure is treated as an in-kind contribution to the candidate with whom it was coordinated, it is subject to the Act's contribution amount limits and source restrictions, *see* 52 U.S.C. §§ 30116(a), (c), (f), 30118, 30119, 30121, as well as its related disclosure requirements, *see id.* § 30104.

28. In the 2025-2026 election cycle, for example, an individual or non-multicandidate PAC may contribute up to $3,500 per election to a federal candidate; for certain multicandidate PACs, that limit is $5,000 per election. 52 U.S.C. § 30116(a)(1)(A); *Contribution limits for 2025-2026*, FEC (issued January 2025) https://www.fec.gov/resources/cms-content/documents/contribution-limits-chart-2025-2026.pdf.

29. FECA also prohibits a corporation or labor union from making a contribution to a federal candidate or political committee. 52 U.S.C. § 30118(a).

30.    Candidates and political committees are prohibited from knowingly accepting any contribution, including in-kind contributions in the form of coordinated expenditures, in violation of any restriction imposed on contributions under the Act. 11 C.F.R. § 110.9.

**B. Separate FEC Regulations Define "Coordinated Expenditures" and "Coordinated Communications"**

31.    The Act defines a coordinated expenditure as one made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B)(i). FEC regulations define "coordination" in almost identical terms to mean "in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." 11 C.F.R. § 109.20(a).

32.    In addition to this general "coordination" regulation, the Commission has also promulgated a regulation pertaining to a subset of coordinated expenditures—those made for certain "coordinated communications"—at 11 C.F.R. § 109.21.

33.    To be a "coordinated communication," a communication must (1) be paid for by a person other than the candidate, as described in 11 C.F.R. § 109.21(a)(1); (2) satisfy one of the "content standards" set forth in 11 C.F.R. § 109.21(c); and (3) satisfy one of the "conduct standards" set forth in 11 C.F.R. § 109.21(d).

34.    As relevant here, the "content standards" set forth in 11 C.F.R. § 109.21(c) all pertain to "public communications," a term defined by the Commission to mean a communication:

> [B]y means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising. The term general public political advertising shall not include communications over the internet, except for communications placed or promoted for a fee on another person's website.

*Id.* § 100.26.

35. The Commission's "coordinated communication" regulation at 11 C.F.R. § 109.21 thus applies only to expenditures for communications disseminated via media covered by the definition of "public communication" at 11 C.F.R. § 100.26.

36. But all other types of expenditures, such as expenditures that do not constitute "coordinated communications" under 11 C.F.R. § 109.21, are governed by the general coordination regulation at 11 C.F.R. § 109.20. Under this regulation, any such expenditure will be treated as an in-kind contribution to a candidate if made "in cooperation, consultation or concert with, or at the request or suggestion of," a candidate or the candidate's campaign committee. *Id.*

## C. FECA Disclosure and Reporting Requirements

37. Transparency about the money raised and spent in federal elections is a core purpose of FECA. The Act's comprehensive disclosure provisions were crafted to "expos[e] large contributions and expenditures to the light of publicity," *Buckley*, 424 U.S. at 67, and to enable an informed electorate by achieving "total disclosure" of the amounts and sources of funds used to influence federal elections, *id.* at 76. *See also* S. Rep. No. 93-689, at 2 (1974) (noting that FECA was "predicated upon the principle of public disclosure"); 52 U.S.C. § 30104.

38. Federal law thus requires all political committees to file regular reports with the Commission disclosing their receipts and disbursements, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(a)(1).

39. Under FECA, any federal political committee, including a candidate or political party committee, must file periodic reports accurately disclosing its receipts, disbursements, and debts and obligations. *See* 52 U.S.C. § 30104(a)(1)-(4), (b). These reports must itemize, *inter alia*, each person to whom the committee has made operating expenditures or other disbursements of over $200, "together with the date[s], amount[s], and purpose[s]" of those expenditures or

10

disbursements, *id.* § 30104(b)(5)(A), (6)(A), (B)(v), and must also include aggregate totals for all receipts, disbursements, and cash-on-hand for the reporting period and election cycle to-date, *see generally id.* § 30104(b).

40.    Reportable contributions include coordinated expenditures—*i.e.*, "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents" —which federal law provides "shall be considered to be a contribution to [the] candidate" with whom the expenditure was coordinated. 52 U.S.C. § 30116(a)(7)(B)(i); *accord* 11 C.F.R. §§ 109.20, 109.21.

41.    Certain expenditures to influence federal elections must also be reported by the person making the expenditure, but only if such expenditures were independent—*i.e.*, "not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents." 11 C.F.R. § 100.16.

42.    Consequently, coordinated expenditures are statutorily required to be reported by the candidate who benefits from them as "a contribution to such candidate," while independent expenditures—those not made in coordination with a candidate—are required to be reported by the person who made the expenditure.

43.    Unsurprisingly, neither FECA nor FEC regulations account for coordinated spending to pay for expenditures (*i.e.*, coordinated expenditures) that the FEC elects not to treat as coordinated expenditures. Thus the FEC, through its legally flawed Advisory Opinion, has purported to create a new category of expenditures that may be made in coordination with a candidate, in unlimited amounts, by spenders that are legally required to operate independently and not in coordination with federal candidates, and which are not reported either as expenditures

by the person who made them, or as contributions by the candidate or committee that received them.

### D. FEC Advisory Opinions

44.     The Commission is charged to "administer, seek to obtain compliance with, and formulate policy with respect to [the] Act." 52 U.S.C. § 30106(b)(l). In accordance with this mandate, the Act authorizes the Commission "to render advisory opinions under section 30108 of this title" and to prescribe such regulations as are necessary to carry out the statute's purposes. *Id.* § 30107(a)(7)-(8).

45.     In particular, Section 30108 of the Act authorizes any person to request an advisory opinion from the FEC "concerning the application of [FECA], or a rule or regulation prescribed by the Commission, with respect to a specific transaction or activity by the person." 52 U.S.C. § 30108(a)(1). The Commission must "accept written comments submitted by any interested party within the 10-day period following the date the request is made public," *id.* § 30108(d), and "render a written advisory opinion relating to such transaction or activity" no more than sixty days after receiving a "complete written request," *id.* § 30108(a)(1).

46.     If the Commission issues a favorable advisory opinion in response to a request, the requestor, and any person involved in a transaction or activity "indistinguishable in all its material aspects from the transaction or activity" described in the request, may rely in good faith on the opinion and be protected from any sanction under the Act. 52 U.S.C. § 30108(c). Advisory opinions thus "have binding legal effect on the Commission." *FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 185 (D.C. Cir. 2001).

## II. Advisory Opinion 2024-01

### A. Texas Majority PAC's Advisory Opinion Request

47.     On January 12, 2024, Texas Majority PAC ("TMP"), a Texas-based state political committee, submitted an advisory opinion request with the FEC seeking guidance on the Act's application to a proposed paid canvassing operation that TMP intended to undertake in open coordination with federal candidates and campaigns. *See* Advisory Opinion Request 2024-01, Texas Majority PAC (dated Jan. 12, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401R_1.pdf ("TMP AOR").

48.     The advisory opinion request sought the Commission's blessing for a paid canvassing program through which TMP would pay vendors to "design and produce canvassing literature" and hire and train individuals to knock on voters' doors, read a script, and hand out the literature. TMP AOR at 2. The literature and scripts would reference federal candidates and parties and include express advocacy on behalf of or in opposition to those candidates and parties. *Id.* at 3. Although TMP openly planned to coordinate with and "consult" federal candidates in connection with these paid canvassing activities, it maintained that the resulting expenditures could not be regulated as coordinated expenditures—*i.e.*, in-kind contributions—under the Act.

49.     As described in its request, TMP's paid canvass would be targeted to preselected voters, TMP AOR at 2; would not be restricted to voters who had opted in to the canvassing visits or who otherwise had a relationship with the paid canvassers or vendors, *id.*; and would involve the dissemination of identical or functionally indistinguishable "Canvassing Literature" and "Scripts" to more than 500 homes within a 30-day period, *id.* at 2 n.4.

50.     Moreover, the Canvassing Literature and Scripts would reference federal candidates and political parties; include express advocacy (or the functional equivalent of express

advocacy) on behalf of or in opposition to federal candidates and parties; and be disseminated in the periods immediately before the relevant federal elections. TMP AOR at 3. And because TMP planned to "consult" with candidates regarding its paid canvass, it anticipated that it would "come into possession of nonpublic plans, projects, activities, or needs of candidates (federal and nonfederal)," *id.*, and thus would engage in "substantial discussion" as defined in the Commission's coordination regulations. *See* 11 C.F.R. § 109.21(d)(3).

51.     Nevertheless—and contrary to FECA's express provision that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, *shall* be considered to be a contribution to such candidate," 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added)—TMP sought the Commission's approval for the proposition that its plans to "consult with federal candidates" on canvassing expenditures benefiting their candidacies, TMP AOR at 3, would not give rise to any coordinated expenditures within the meaning of the Act or Commission regulations. *Id.*

52.     To convince the Commission that its proposed expenditures for a paid canvass explicitly coordinated with and benefiting federal candidates could not give rise to any in-kind contributions—regardless of the expenditure's unambiguous, election-influencing purpose or degree of coordination with candidates—TMP focused exclusively on the FEC's "coordinated communication" regulation at 11 C.F.R. § 109.21, while all but ignoring FECA's statutory text and the FEC's general coordination rule mirroring it, *see* 11 C.F.R. § 109.20.

53.     According to the faulty analytical framework that TMP advocated and the Commission ultimately embraced, the group's proposed canvassing expenditures failed to satisfy the "content" standards of 11 C.F.R. § 109.21 because none involved "public communications" or

"electioneering communications"—and therefore, because the expenditures involved communications but not "public communications" as defined in 109.21, they categorically could not be treated as coordinated expenditures under either FECA or the FEC's general coordination rule, 11 C.F.R. § 109.20.

54.    Several commenters, including plaintiff CLC, filed written comments responding to TMP's request.

55.    Commenters from within the regulated community, including a party committee, labor union, and campaign finance law practitioner, generally supported TMP's deregulatory agenda.[1]

56.    CLC's comment, in contrast, explained that TMP's attempt to exclude entire categories of coordinated spending from regulation as in-kind contributions was contrary to FECA's statutory text and purposes, recent judicial authority, and Commission precedent. *See* Comment on AOR 2024-01 by Campaign Legal Center (dated Feb. 2, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401C_1.pdf.

57.    In particular, CLC noted in its comment that "[w]hile FECA includes a few narrow exemptions for goods or services that cannot be treated as 'contributions' or 'expenditures,' there is no exemption for paid canvasses—and the Commission cannot create such an exemption when there is no basis in the statutory text." CLC Comment re: AOR 2024-01 at 2. Indeed, TMP's request to exempt canvassing expenditures openly coordinated with candidates proposed

---

[1]    *See* Comment on Draft AO 2024-01, Agenda Document Nos. 24-08-A and 24-08-B by Neil Reiff (dated Feb. 26, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401C_3.pdf; Comment on Draft AO 2024-01, Agenda Document Nos. 24-08-A and 24-08-B by AFL-CIO (dated Feb. 28, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401C_5.pdf; Comment on Draft AO 2024-01, Agenda Document Nos. 24-08-A and 24-08-B by NRSC (dated Mar. 13, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401C_6.pdf.

"precisely the type of 'wholesale coordinated [] operation'" that a federal district court had recently warned could not be treated as outside the purview of FECA's coordination framework. *Id.* at 3 (quoting *Campaign Legal Ctr. v. FEC*, 646 F. Supp. 3d 57, 66 (D.D.C. 2022)). Finally, as CLC's comment further explained, TMP's position that paid canvassing is not a "public communication" was unsupported by the Commission's own precedent. *Id.*

58.     The FEC thereafter produced two draft responses, designated Drafts A and B, to TMP's request. *See* FEC, Agenda Doc. No. 24-08-A, Draft Advisory Opinion 2024-01: Draft A (dated Feb. 21, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401.pdf; FEC, Agenda Doc. No. 24-08-B, Draft Advisory Opinion 2024-01: Draft B (dated Feb. 21, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401_1.pdf.

59.     Draft A—which the Commission failed to approve in a 2-4 tally vote, *see* Certification, FEC Advisory Opinion 2024-01 (dated Mar. 20, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401V_2.pdf—concluded that TMP's paid canvass did constitute a coordinated communication under 11 C.F.R. § 109.21. In particular, Draft A would have found that TMP's proposed canvass qualified as a "public communication" because it was a form of "general public political advertising," *see* 52 U.S.C. § 30101(22), an interpretation buttressed by findings that, *inter alia*, "TMP proposes to pay a third-party vendor to create and distribute communications to the general public," Draft A, Advisory Opinion 2024-01 at 8; the "proposed Paid Canvass is functionally similar to forms of media that are listed in the statutory definition" of public communication, including phone banks and mass mailings, *id.* at 9; and the Commission has previously found "that materials distributed door-to-door can constitute general public political advertising," *id.* Having established that the proposed canvass involved one of the enumerated forms of communications in 11 C.F.R. § 109.21, it readily satisfied the remaining

16

elements of the coordinated communication test. *See id.* at 10-11 (noting that TMP's proposal met the conduct and content standards, respectively, because the group "acknowledge[d] that it will engage in substantial discussion" with candidates or parties, and its "canvassing communications will include express advocacy or its functional equivalent and will refer to federal candidates or political parties within the relevant pre-election timeframes").

**B. The Commission Endorses TMP's Reading of the Act and FEC Regulations by Issuing Advisory Opinion 2024-01**

60.    On March 20, 2024, the Commission rendered its final opinion endorsing TMP's request, voting 4-2 to approve Draft B. *See* Certification, FEC Advisory Opinion 2024-01 (dated Mar. 20, 2024), https://www.fec.gov/files/legal/aos/2024-01/202401V_1.pdf.

61.    The Advisory Opinion recognized that expenses for canvassing "are expenditures." AO 2024-01 at 7. Nevertheless, the Commission concluded that such communication-related expenditures, even if coordinated with a candidate's campaign, would not be treated as contributions. Eschewing any examination of the actual statutory text, the Advisory Opinion moves immediately to assessing the request under the FEC's own regulatory regime for coordinated expenditures: coordinated communications governed by 11 C.F.R. § 109.21, coordinated party expenditures governed by 11 C.F.R. § 109.37, and the general provision for all other coordinated expenditures governed by 11 C.F.R. § 109.20.

62.    Turning first to 11 C.F.R. § 109.21, the Advisory Opinion concluded that canvassing, despite being a type of communication, was not among the subset of enumerated "public communications" covered by the FEC's rule. AO 2024-01 at 5 (concluding canvassing is not a form of "general public political advertising"). Affording undue weight to a speaker's proximity to their audience, the Opinion found that door-to-door canvassing differs from other types of covered communications, like "telephone bank[ing]," because canvassing involves

17

"individual people talking face-to-face with voters." *Id.* at 6. But the Commission did not further elucidate the reasoning underpinning that assumption, beyond broadly characterizing canvassing as "a traditional grassroots activity" unlike "the type of mass communication contemplated in the definition of 'public communication.'" *Id.* at 6-7. Accordingly, it found that canvassing could not be deemed a coordinated communication under that rule. *Id.* at 7.

63.    The Advisory Opinion next turned to the catch-all definition in 11 C.F.R. § 109.20(b), which provides in relevant part:

> Any expenditure that is coordinated within the meaning of paragraph (a) of this section, but that is not made for a coordinated communication under 11 C.F.R. § 109.21 . . . is . . . an in-kind contribution to . . . the candidate or political party committee with whom or with which it was coordinated and must be reported as an expenditure made by that candidate or political party committee.

64.    The Commission concluded that this general coordination provision was inapplicable because it treated the carve-out for "coordinated communications" as encompassing *any* communication-related expenditure, not just "coordinated communication[s] under 11 C.F.R. § 109.21." *See* AO 2024-01 at 7. In circular fashion, the Advisory Opinion thus posited that TMP's canvassing was a "coordinated communication" for purposes of the carve-out in 11 C.F.R. § 109.20, but was *not* a "coordinated communication" for purposes of 11 C.F.R. § 109.21—opening an impermissible and arbitrary gap between the two regulatory provisions.

65.    Conspicuously absent from the Advisory Opinion's analysis was any attempt to square its myopic focus on the "public communication" definition—which it read narrowly to exempt an entire class of avowedly coordinated expenditures from regulation—with the statutory coordination provisions, which are not so limited. Indeed, FECA makes no mention whatsoever of "public communications" or "communications" in defining coordination, but applies without

exception to all "*expenditures* made by any person in cooperation, consultation, or concert" with a candidate or party. 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added).

66.    The Advisory Opinion's artificially limited focus on whether TMP's expenditures constituted "public communications" for purposes of the Commission's own regulation conflicts with FECA, which does not disaggregate coordinated expenditures into separate categories of communication and non-communication expenditures, but rather describes a unitary set of "expenditures made . . . in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B)(i).

67.    It was the FEC, not Congress, that opted to define a subset of coordinated expenditures by reference to elaborate content standards. *See* 11 C.F.R. § 109.21(c). In promulgating and applying those standards, however, the Commission's statutory authority to delineate the regulation of coordinated spending is limited to determining whether spending is an "expenditure" in the first place. *See Shays v. FEC*, 414 F.3d 76, 99 (D.C. Cir. 2005) ("*Shays II*"); *see also* 52 U.S.C. § 30101(9)(A)(i) (defining "expenditures" as "payment[s]" made "for the purpose of influencing any election for Federal office"). While the agency might permissibly employ some content standard to clarify whether spending is "undertaken 'for the purpose of influencing' a federal election," *Shays II*, 414 F.3d at 99, it cannot use those content standards to exempt an entire category of coordinated spending that *does* satisfy "the expenditure definition's purposive language" from regulation. *Id.*

68.    In nevertheless applying its regulatory content standards to supersede Congress's directive that all coordinated "expenditures" be treated as contributions, the Advisory Opinion "directly frustrates" the purposes of federal campaign finance law and poses a demonstrable risk

19

of abuse—by creating a new regulatory loophole in a context where the D.C. Circuit has repeatedly admonished against them. *See, e.g.*, *Shays v. FEC*, 528 F.3d 914, 925 (D.C. Cir. 2008) ("*Shays III*") ("[B]y allowing soft money a continuing role in the form of coordinated expenditures, the FEC's . . . rule would lead to the exact perception and possibility of corruption Congress sought to stamp out."); *Shays II*, 414 F.3d at 115. The FEC's flawed determination that paid canvassing falls outside the ambit of the Act's coordination provisions likewise creates an "enormous loophole" and the "potential for gross abuse." *Shays III*, 528 F.3d at 927-28.

69.     More recently, the D.C. Circuit rejected an analogous attempt by the FEC to apply its coordinated communication rule—and the "public communication" definition incorporated therein—to avoid treating any of a political committee's expenditures as contributions, even though all of those expenditures were admittedly coordinated with a single federal presidential candidate. *See Campaign Legal Ctr. v. FEC*, 106 F.4th 1175, 1191 (D.C. Cir. 2024). Even where, as in that case, some of the committee's coordinated spending ostensibly did qualify for a narrow exemption from the FEC's "public communication" definition applicable to certain unpaid internet communications, an FEC-created regulatory exemption did not give the agency license to ignore the statutory text or broaden an already tenuous exemption from that text:

> We hold that the Commission's approach is contrary to FECA's expansive definition of expenditures, 52 U.S.C. § 30101(9)(A)(i), and its regulation of all expenditures made "in cooperation, consultation, or concert with, or at the request or suggestion of" a candidate or party, *id.* § 30116(a)(7)(B). By reading FEC regulations to exempt any expenditure even remotely or tangentially related to an eventual posting on the internet, the controlling commissioners pave a path for the very circumvention of campaign finance laws that FECA's reporting requirement is designed to prevent.

*Campaign Legal Ctr. v. FEC*, 106 F.4th at 1191.

70.     Finally, the Commission's analysis in the Advisory Opinion disregards the plain text of its *own* regulations. By its express terms, the carve-out for "coordinated communications"

20

set forth in 11 C.F.R § 109.20 applies only to an expenditure that is for "a coordinated communication under 11 C.F.R. § 109.21." 11 C.F.R. § 109.20(b). Therefore, even where a coordinated expenditure is not covered by 11 C.F.R. § 109.21 because, for example, it is not among the enumerated communications covered by that rule, it is still subject to the general coordination rule at 11 C.F.R. § 109.20—and more importantly, to the statutory text the rule mirrors.

## C. Advisory Opinion 2024-01 Rapidly Upends Federal Campaigns and Undermines FECA's Transparency Requirements

71.    After the Advisory Opinion was issued in March 2024, in the midst of a heated presidential election cycle, candidates, political parties, and third-party groups immediately seized on this new means of supercharging their federal campaigns while sidestepping FECA contribution restrictions and disclosure requirements. The attendant harms to FECA's core anticorruption and transparency objectives have been profound.

72.    The regulated community quickly touted how the Advisory Opinion would "mak[e] it much easier for federal candidates to offload their paid canvassing programs onto state PACs, nonprofits, and super PACs" and "light[] the way for candidates to shift more costs to outside groups, all while aligning on message and strategy." Justin Rusk & Meredith K. McCoy, *FEC Allows Nonfederal Committee to Coordinate Paid Canvassing Efforts with Federal Candidates*, Venable LLP Pol. L. Briefing (Mar. 27, 2024), https://www.politicallawbriefing.com/2024/03/fec-allows-nonfederal-committee-to-coordinate-paid-canvassing-efforts-with-federal-candidates [https://perma.cc/F8ZF-THBV].[2]

---

[2]    *See also, e.g.*, Political Law Playbook - April 2024, Dentons (Apr. 24, 2024), https://www.dentons.com/en/insights/newsletters/2024/april/24/political-law-playbook/political-law-playbook-april-2024 ("This guidance from the FEC will have far-reaching impacts on many non-campaign entities that currently engage in paid canvassing and have been reporting such activity as independent expenditures with the FEC."); In Compliance: Holtzman Vogel's Monthly Round-Up, Holtzman Vogel (Mar. 2024), https://www.holtzmanvogel.com/uploads/In-

73.     Likewise, one month after the Advisory Opinion was issued, the Trump campaign's 2024 political director, James Blair, reportedly described it as a "game-changer." Alex Isenstadt, *Trump camp plans sit-down with outside groups after FEC relaxes coordination rules*, Politico (Apr. 26, 2024), https://www.politico.com/news/2024/04/26/trump-2024-fec-00154727. The campaign also reportedly invited outside groups to an "entirely off-the-record, private" meeting with senior campaign officials to "discuss new opportunities (in light of a recent FEC ruling) for our organizations to collaborate more effectively than we have been able to in the past." *Id.*

74.     As candidates and groups have embraced their new ability to coordinate canvassing expenditures under the Advisory Opinion, there have already been serious issues regarding how— or whether—statutorily required information about such expenditures is being disclosed. Under the Act, coordinated expenditures must be reported by both the political committee that makes them and by the candidate who receives them, itemized with each contribution's date, amount, and purpose. *See* 52 U.S.C. § 30104(b); *see also supra* ¶¶ 37-43. However, none of the groups that publicly announced plans to coordinate canvassing activities with candidates or political party committees disclosed making any such coordinated expenditures in their FEC filings, nor did the associated candidates or parties disclose receiving any.

75.     While some of those groups have reported general disbursements or independent expenditures whose purpose included "canvassing," their FEC reports give no indication of whether the canvassing expenditures were coordinated with candidates or parties. Where it exists,

---

Compliance-March-Round-Up-6.pdf ("This advisory opinion opens the door to paid canvassing operations around the country that are coordinated with and support federal candidates but are paid for with non-federal funds."); Zachary Parks, Derek Lawlor and Andrew Garrahan, *Despite Political Divide, FEC Found Common Ground In '24*, Law360 (Jan. 22, 2025), https://www.cov.com/-/media/files/corporate/publications/2025/01/despite-political-divide-fec-found-common-ground-in-24.pdf (describing advisory opinion as "game-changing" and "transformative").

the limited information that can be gleaned from such reports is no substitute for the detailed and comprehensive disclosure secured by FECA. For example, some political committees reported canvassing-related expenditures on Schedule E as independent expenditures (*e.g.*, Elon Musk's America PAC)—which identify the candidate supported or opposed, the amount spent, and other information. *See infra* ¶ 85. Other committees (*e.g.*, Turnout for America), reported canvassing-related expenditures as regular Schedule B disbursements in their periodic committee filings, without identifying the candidates those expenditures supported or opposed. *See infra* ¶ 86. Meanwhile, some non-committee groups failed to report anything at all, even where they openly acknowledged coordinating with a candidate on paid canvassing communications that contained express advocacy (*e.g.*, the 501(c)(4) corporation Turning Point Action, *see infra* ¶¶ 78-83).

76. None of the reports that have been filed with the FEC and reviewed by CLC to date give any indication of whether the filers' canvassing expenditures were coordinated with candidates or party committees, nor did any of the candidates that ostensibly benefited from such coordinated canvassing efforts—according either to their own public statements or to news reports—disclose any corresponding in-kind contributions.

77. But it is clear that groups are taking advantage. Indeed, committees have directly cited Advisory Opinion 2024-01 as an explanation for their canvassing-related expenditures. *See, e.g.*, Solidarity Victory PAC, FEC Form 3X, 2025 Mid-Year Report at 14-15 (July 31, 2025), https://docquery.fec.gov/pdf/457/202507319789382457/202507319789382457.pdf (reporting around $100,000 in Schedule B disbursements for "door to door canvassing," and specifying in the purpose of disbursement line "not IE per Advisory Opinion 2024[-01]").

78. Insofar as information about non-disclosing groups is even partially ascertainable, it generally must be pieced together from news reports or the spender's own public statements.

Partial or nonexistent disclosure information is no substitute for the detailed reporting that FECA requires.  Indeed, the case of Turning Point Action—one of the non-committee groups that publicly acknowledged spending on coordinated canvassing expenditures expressly advocating for or against federal candidates, but never reported any of those expenditures to the FEC—offers a potent illustration of the Advisory Opinion's deleterious effects on transparency.

79.    Turning Point Action, a tax-exempt 501(c)(4) corporation founded by Charlie Kirk, is not registered with the Commission as a political committee and does not disclose its donors.[3]

80.    Nevertheless, Turning Point Action operated a robust canvassing program in 2024, and, on numerous occasions, publicly acknowledged that it was coordinating those canvassing activities with the Trump campaign to benefit him in the 2024 presidential election. According to published reports by the news media, the effort had Turning Point Action spearheading a nine-figure "chase the vote" canvassing program in full coordination with the Trump campaign. Ed Pilkington, *Charlie Kirk once unified conservative youth for Trump. Why are Republicans now turning on him?*, The Guardian (June 25, 2024), https://www.theguardian.com/us-news/ng-interactive/2024/jun/25/charlie-kirk-turning-point-usa-chase-the-vote-trump    [https://perma.cc/CDJ5-YXMA]. The program also focused on swing states, including Wisconsin. *Id.*[4] Subsequent

---

[3]    Turning Point consists of three organizations: Turning Point Action (a tax-exempt 501(c)(4) corporation); Turning Point USA (a 501(c)(3) tax-exempt entity); and Turning Point PAC Inc. (a hybrid PAC). *See* Turning Point Action Inc, 2023 Form 990, ProPublica (May 15, 2024), https://projects.propublica.org/nonprofits/organizations/464331510/202441369349310204/full; *About TPAction*, Turning Point Action, https://www.tpaction.com/about (last visited May 5, 2026).

[4]    *See also* Lawrence Andrea, *Behind the scenes of the Supreme Court race, a 'turf war' simmers between Wisconsin GOP and Turning Point*, Milwaukee J. Sentinel (Feb. 24, 2025), https://www.jsonline.com/story/news/politics/elections/2025/02/24/republican-turn-war-churns-with-turning-point-wisconsin-gop/78464536007 (describing Wisconsin as "focal point" for Turning Point Action's "chase the vote" initiative)

24

social media posts by Turning Point Action confirmed that the organization engaged in door-knocking in support of the Trump campaign in the state.[5]

81.     Throughout its 2024 canvassing push, Turning Point Action touted its newfound ability to coordinate with candidates. On a June 4, 2024 podcast, for example, Kirk and Turning Point Action spokesperson Andrew Kolvet explicitly discussed the group's coordination with the Trump campaign:

> Kolvet: "Turning Point Action's ballot chase initiative, and remind you, *we are working directly in coordination with the Trump campaign*. That's a new FEC rule and regulation. Charlie, I don't want to get over my skis there, but it's an extension–"
>
> Kirk: "We're allowed to work in harmony on doors and canvassing. That's what the law says."

J.D. Wolf, *Anti-MLK Charlie Kirk Confirms His Group is Working Directly with Trump*, MeidasTouch News, at 00:09 (June 4, 2024), https://meidasnews.com/news/anti-mlk-charlie-kirk-confirms-his-group-is-working-directly-with-trump (emphasis added) (including embedded clip from an episode of "ThoughtCrime" podcast featuring Kirk). Officials from Turning Point Action were also widely quoted in reports by other news outlets regarding the group's coordination with President Trump's reelection campaign; Turning Point Action officials characterized those efforts as transforming the group into "officially a[n] arm of the Trump campaign." Russell Payne, *"Nightmare scenario": Trump campaign's coordination with outside groups tests FEC "loophole"*, Salon (Oct. 18, 2024), https://www.salon.com/2024/10/18/

---

[5]     *See, e.g.*, Turning Point Action Coalitions (@TPACoalitions), X (Oct. 23, 2024, at 12:25 PM), https://x.com/TPACoalitions/status/1849125000248254552 [https://perma.cc/9MWB-3GWS] (reposted from SamK @SamKrieg2000); Charlie Kirk (@charliekirk11), X (Oct. 2, 2024, at 11:25 AM), https://x.com/charliekirk11/status/1841499851764420896 [https://perma.cc/FDQ9-T77Z]

nightmare-scenario-campaigns-coordination-with-outside-groups-tests-fec-loophole

[https://perma.cc/N6T9-9VSM].

82.    However, notwithstanding Turning Point Action's blatant coordination of its $100 million-plus door knocking operation with and on behalf of the Trump campaign, the campaign did not report any contributions from Turning Point Action in 2024. *See* Never Surrender*, Inc.,* Receipts,    2023-24,    FEC,    https://www.fec.gov/data/receipts/?data_type=processed& committee_id=C00828541&contributor_name=C90019597&two_year_transaction_period=2024 (last visited May 5, 2026). For that matter, since the Advisory Opinion, the Trump campaign appears to have reported no contributions or coordinated expenditures for canvassing at all.[6]

83.    For its part, Turning Point Action likewise failed to disclose a single dollar in spending associated with this effort. Despite running an extensive canvassing operation in at least two states, in avowed coordination with the Trump campaign and with the stated goal of encouraging voters to elect Trump, Turning Point Action reported *no* independent expenditures to the FEC in the 2024 cycle—and thus, because Turning Point is not a federal political committee required to report its receipts and disbursements, none of this overtly coordinated 2024 spending was disclosed in any form to the FEC. In the prior two election cycles, by contrast, the group had reported independent expenditures for advertising.[7]

---

[6]    *See    generally*    Never    Surrender,    Inc.,    Disbursements,    FEC, https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00828541 (last visited May 5, 2026) (itemizing all-time disbursements for Never Surrender, Inc., and its predecessor committee, Donald J. Trump for President 2024, Inc.).

[7]    *See* Turning Point Action, Independent Expenditures, 01/01/2021–12/31/2022, FEC, https:// www.fec.gov/data/independent-expenditures/?data_type=processed&q_spender=C90019597&is _notice=false&min_date=01%2F01%2F2021&max_date=12%2F31%2F2022 (last visited May 5, 2026); Turning Point Action, Independent Expenditures, 01/01/2019–12/31/2020, FEC, https:// www.fec.gov/data/independent-expenditures/?data_type=processed&q_spender=C90019597& is_notice=false&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020 (last visited May 5, 2026).

84.    With respect to FEC reporting from other third-party spenders, CLC has identified a range of approaches among groups that have either publicly acknowledged coordinating canvassing expenditures with candidates or parties, or that have reportedly done so. But none of those available FEC reports vindicate plaintiff's informational rights under FECA.

85.    For example, America PAC, a federal super PAC primarily funded by Elon Musk— who contributed most of the group's overall $261 million in total disbursements during the 2024 cycle[8]—was prominently featured in media reports describing how the Trump campaign planned to take advantage of the Advisory Opinion to coordinate its ground game activities with outside groups.[9] Nevertheless, although America PAC reported spending over $97 million during the 2024 cycle on independent expenditures whose purpose included "CANVASSING," none of those reports indicated whether the expenditures were coordinated with the candidate(s) they supported.[10] Nor did the candidates reportedly benefiting from this largesse disclose receiving any corresponding in-kind contributions in their own FEC filings. *See, e.g.*, *supra* Note 6.

---

[8]    *See* America PAC, Financial Summary, 2023-24, FEC, https://www.fec.gov/data/committee/C00879510/?cycle=2024 (last visited May 5, 2026).

[9]    *See* Theodore Schleifer, *Trump Gambles on Outside Groups to Finance Voter Outreach Efforts*, N.Y. Times (Aug. 14, 2024), https://www.nytimes.com/2024/08/14/us/politics/trump-voter-outreach-super-pacs.html; Isaac Arnsdorf and Josh Dawsey, *Trump team gambles on new ground game capitalizing on loosened rules*, Wash. Post (Aug. 3, 2024), https://www.washingtonpost.com/politics/2024/08/03/trump-allies-ground-game [https://perma.cc/B2VJ-X3TY].

[10]    *See, e.g.*, America PAC, Independent Expenditures for "Canvassing/Field Operations", 01/01/2023-12/31/2024, FEC, https://www.fec.gov/data/independent-expenditures/?two_year_transaction_period=2026&data_type=processed&q_spender=C00879510&cycle=2024&is_notice=true&payee_name=blitz&payee_name=echo+canyon&payee_name=in+field&payee_name (last visited May 5, 2026) (filtering expenditures by six vendors that received payments in 2023-24 cycle for a reported purpose of "canvassing/field operations"). *See also, e.g.*, America PAC, 24/48 Hour Report of Independent Expenditures (FEC Schedule E), at 45 (Oct. 29, 2024), https://docquery.fec.gov/cgi-bin/fecimg/?20241029971840781.

86.    In contrast, most canvassing-related spending disclosed by Turnout for America, a federal super PAC created in 2024 for the purpose of coordinating with the Trump campaign to mobilize likely Trump voters, was reported as regular committee disbursements on Schedule B. *See, e.g.*, Turnout for America, Disbursements for "Canvassing", 2023-2024, FEC, https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00883520&two_year_transaction_period=2024&disbursement_description=canvassing (last visited May 5, 2026) (reporting approximately $26.1 million in disbursements to Patriot Grassroots for "canvassing" between August and October 2024). The New York Times described Turnout for America as "one of several new pro-Trump organizations seeking to take advantage" of the Advisory Opinion, and according to an internal strategy memo obtained by the Times, the group "intend[ed] to 'operate in concert' with Mr. Trump's campaign." Kenneth P. Vogel and Theodore Schleifer, *Facing Harris's Momentum, Trump Allies Plan $45 Million Ground Game*, N.Y. Times (July 30, 2024), https://www.nytimes.com/2024/07/30/us/politics/trump-super-pac-voter-turnout.html. But none of the group's reported canvassing-related disbursements indicated which candidate(s) they supported, much less whether they were coordinated with any candidates.

87.    As a result of the Advisory Opinion and the undisclosed coordinated spending it enabled and will continue to allow, plaintiff CLC is deprived of vital, statutorily required information about the campaign contributions flowing to federal candidates and political parties in the guise of coordinated canvassing expenditures. Only a fraction of the spenders that have reportedly capitalized on the Advisory Opinion appear to have disclosed any information about such expenditures to the FEC, much less reported the requisite information regarding the specific amounts, dates, and purposes of each coordinated expenditure or in-kind contribution. Therefore, it is impossible to know the overall magnitude of "disguised" campaign contributions

disbursements the Advisory Opinion keeps hidden, and harder still to discern the precise sources and amounts of contributions made to specific candidates or parties in the form of coordinated canvassing expenditures—although under FECA, CLC and the public are entitled to receive this information.

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to Law

88. Plaintiff repeats and realleges paragraphs 1-87 as if set forth fully herein.

89. The FEC is an "agency" under the APA. 5 U.S.C. § 551(1).

90. The FEC's issuance of Advisory Opinion 2024-01 is final agency action subject to judicial review under the APA. 5 U.S.C. § 704. *See also FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 185 (D.C. Cir. 2001); *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010).

91. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is not in accordance with law if the action is contrary to or otherwise fails to implement the statutory directives of Congress, as reflected in the statute's text, structure, and purpose.

92. The Commission recognized that the canvassing described in Advisory Opinion 2024-01 constitutes an "expenditure" within the meaning of the Act. But beyond that point, its analysis wholly diverged from FECA. Instead, the Commission fixated on its own regulatory regime for coordinated communications, extending an unduly constrained view of those rules while effectively treating them as more authoritative than the statute. But an agency cannot "simply 'close its eyes' to the existence of the statute," *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 516 (1983) (Marshall, J., dissenting), or "rely on one of its own regulations to trump the plain

meaning of a statute," *Atl. City Elec. Co. v. Fed. Energy Regul. Comm'n*, 295 F.3d 1, 11 (D.C. Cir. 2002).

93.     And under FECA, any *expenditure* made for the purpose of influencing a federal election and that is coordinated with a federal candidate or political party, whether for a communication or for any other "thing of value," must be treated as a contribution. As the D.C. Circuit explained in *Shays II*, "if a communication involves 'expenditure' and is made 'in cooperation, consultation, or concert with, or at the request or suggestion of' a candidate or party— the provision's two elements—then the FEC lacks discretion to exclude that communication from its coordinated communication rule." 414 F.3d at 99 (quoting 52 U.S.C. § 30116(a)(7)(B)).

94.     Courts "must reject administrative constructions of [FECA] . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981). Here, there is no possible justification for a construction, based not on the agency's governing statute but on a strained application of its own regulations, that not only contravenes, but purports to supersede, the Act's plain language.

95.     The Advisory Opinion unlawfully narrows the scope of FECA's coordination provisions in contravention of Congress's clear directive to regulate all "expenditures" coordinated with candidates or political parties as in-kind contributions. By purporting to exempt through administrative action what the statutory text explicitly covers, the Advisory Opinion is contrary to law under the APA.

## COUNT II
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious Agency Action

96.     Plaintiff repeats and realleges paragraphs 1-95 as if set forth fully herein.

30

97.     The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

98.     An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must set aside agency action "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

99.     Advisory Opinion 2024-01 was arbitrary and capricious in several of these respects.

100.    For one thing, the Advisory Opinion adopted an unduly constrained and arbitrary interpretation of the Commission's own coordination rules and precedent, without providing any cogent reasoning to justify it. In myopically focusing on the coordinated communication regulation at 11 C.F.R. § 109.21, the Commission misinterpreted the "public communication" definition to exclude paid canvassing that clearly falls within its confines, and irrationally disregarded the FEC's general rule covering coordinated expenditures at 11 C.F.R. § 109.20—which by its terms covers any expenditures that do not qualify as "coordinated communication[s] under 11 C.F.R. § 109.21." The Opinion's truncated and conclusory reasoning fails to provide "a satisfactory explanation for its action 'including a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted).

101.　Moreover, an agency action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *State Farm*, 463 U.S. at 43).

102.　For decades, the FEC has failed to properly implement FECA's limits on coordinated spending, and for decades, it has seen its various attempts to weaken those protections rebuffed by courts. By now the agency should have been able to anticipate that the creation of a new regulatory safe harbor would have wide-ranging and harmful effects on the statutory scheme devised by Congress; certainly, courts that have invalidated prior FEC coordination rules were well aware of this dynamic. *See Shays II*, 414 F.3d at 115 ("[I]f regulatory safe harbors permit what [the Bipartisan Campaign Reform Act] bans, we have no doubt that savvy campaign operators will exploit them to the hilt, reopening the very soft money floodgates BCRA aimed to close."). But the FEC nevertheless failed to consider how the Advisory Opinion would undermine the Act's purposes or promote rampant circumvention of its transparency requirements.

103.　The FEC's failure to consider this utterly foreseeable problem—even after repeated admonitions from federal courts—renders its action arbitrary and capricious, in violation of the APA. So, too, does its failure to provide a reasoned basis for its conclusions, or to explain how those conclusions comport with recent court decisions.

104.　The FEC's violations of the APA have caused and will continue to cause ongoing harm to plaintiff for which there is no adequate remedy at law.

105.　For these reasons, plaintiff is entitled to an order vacating and enjoining Advisory Opinion 2024-01 and declaring its interpretation of FECA unlawful.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)   Declare that the FEC's approval of Advisory Opinion 2024-01 is contrary to law and arbitrary and capricious, in violation of FECA and the APA;

(2)   Vacate and set aside Advisory Opinion 2024-01;

(3)   Award plaintiff its costs and reasonable attorney's fees incurred in this action; and

(4)   Grant such other relief as the Court may deem just and proper.

Dated: May 6, 2026                                    Respectfully submitted,

/s/ Megan P. McAllen

Stuart McPhail (DC Bar No. 1032529)      Megan P. McAllen (DC Bar No. 1020509)
CITIZENS FOR RESPONSIBILITY AND ETHICS   Erin Chlopak (DC Bar No. 496370)
    IN WASHINGTON                        Kevin Hancock (DC Bar No. 90000011)
P.O. Box 14596                           CAMPAIGN LEGAL CENTER
Washington, DC 20044                     1101 14th St. NW, Suite 400
(202) 408-5565                           Washington, D.C. 20005
Email: smcphail@citizensforethics.org    (202) 736-2200
                                         Email: mmcallen@campaignlegalcenter.org
                                         Email: echlopak@campaignlegalcenter.org
                                         Email: khancock@campaignlegalcenter.org